Mr. Whitburn, when you're ready. May it please the court. No court, including this court, has questioned the unanimous medical opinions of Barbara Harrison's treating physicians that, one, she requires one-on-one, 24 hours a day, seven days per week, licensed nursing care to survive, and two, moving her to an institutional setting would result in an extreme risk of death to her. This case has been going on for several years. Where is she now? The district court found that Berry Family Services could take care of her at five and a half hours per week. They couldn't. Berry Family Services had to move her out. We have had to take extreme measures to put her in a group home where she, and she's been there since April of 2023, she has a registered nurse taking care of her. She has three staff members. I beg your pardon, Your Honor? The registered nurse is not with her 24-7. The registered nurse has carefully trained three staff members on Barbara Harrison's unique disability, on the sunctioning, on the aspiration, but she's been hospitalized. It's not working out very well. It's a very temporary bridge placement. So she's only there until we can get this litigation resolved. The physicians continue to maintain that she absolutely needs the 24-7, one-on-one licensed nursing care. Is she in the hospital now? She's not in the hospital now, no. She has been hospitalized during her stay at this new group home. And she was not, she did not, was not hospitalized during her stay at Berry Family Services. And so our contention remains that institutionalization is still certainly impending. And Your Honor, this Court does not need to take my word for that because it would make sense to add to the list that this Court originally instructed the district court to find, the findings whether institutionalization is certainly impending for Barbara Harrison given her status at the new group home. That would, it would make sense to remand to the district court because none of this is in the record. It would make sense to remand to the district court to do what this Court instructed the district court to do in the first place, make findings about fundamental alteration. And now to add to that list, make findings about whether or not institutionalization is certainly impending a la United States v. Mississippi. This Court recently cited this case, in fact, in United States v. Mississippi in noting with approval the district court's finding that the treating physicians were credible. This extreme risk of death to Ms. Harrison and undeniable irreparable harm was one of the reasons why the district court below originally granted Ms. Harrison a preliminary injunction so that she could continue to receive the life-sustaining nursing services until this litigation could reach its conclusion. However, this Court remanded back to the district court with instructions to engage in more fact-finding to compare the burdens to defendant of caring for Barbara in the community with the burdens of institutionalizing her and to make a determination as to whether in light of such a comparison, the provision of community care would constitute a fundamental alteration. The district court below never made such factual findings despite the instructions of this Court determining instead that Barbara's ADA and Section 504 claims were moot. Has there been any district court finding either on the original, before the original appeal or since on what level of care Ms. Harrison needs? Did the district court make findings on that? No, Your Honor. Any time, either before the first appeal or now, there's never been a finding as to what level of care, 24-7, five hours a day, whatever? No, there's never been a finding on that, Your Honor. So, how do you interpret Judge Costa's opinion on the remand? He says that the Olmstead claim has not been proven, so if there were to be fact-findings, it would seem to be on the three factors of Olmstead, including whether this is a reasonable accommodation. Do you have a reaction? Is that the right way to interpret the opinion? I think the right way to interpret the opinion is that Judge Costa had some concerns about the cost cap issue, that for preliminary injunction purposes, Judge Costa wasn't willing to make a ruling on that issue, but that the Court wanted additional findings with respect to whether or not there would be a fundamental alteration to require the State to provide general revenue funding as opposed to institutionalizing Barbara. With respect to the cost cap issue, I think that the Court misunderstood one fundamental fact about this case in expressing its concern in that way and inciting ARC v. Washington as a possible candidate for a comparable case, because in ARC of Washington, the question was whether the State should be forced to actually expand the number of waiver slots in its program. No one here, and certainly not Barbara Harrison, certainly not Plaintiff, is asking the State of Texas to expand its cost cap. That has never been an issue. In fact, the Plaintiff has indicated that there are other cases that have suggested that one option for the State to take is to expand its cost cap, but it need not do that, and Plaintiff's not asking it to do that here. In fact, in the record, and I'll direct the Court's attention to ROA 323-4, this is part of the State of Texas waiver application to the CMS. And what the State of Texas there is answering a question from the United States as to what it's going to do in a situation exactly like Barbara Harrison's here. What happens if a, if somebody's on the HCS waiver program and their needs increase such that their needs, put them in a situation where they extend past the cost cap? What happens? Well, the State of Texas in its application to CMS says, well, we have three different options here. They didn't mention the fourth, which would be to actually expand the cost cap, but they, the State of Texas gave three different options, saying, well, we could, we could see if there's any third-party funding that could supplement the waiver program. That's never been an issue here. There's never been any third-party funding available. But there's two other options, institutionalization and provision of general revenue funds. And all we're asking here, all we've ever been asking is for the, for there to be a determination as to whether, and this, this I think is an answer to your question as well, Judge Southwick, is, I think this is what Judge Costa was asking, is it more burdensome to the State to go with institutionalization or to go with provision of the general revenue funding? The State of Texas is going to be spending money either way, which, in which case is it going to be spending more? If it's going to be spending more to institutionalize her, then it would be to provide general revenue funding. Then it's Contra Olmstead to force her into an institution. Well, counsel, is the, your argument, though, is based on a fact-finding at some stage that Ms. Harrison needs 24-7 care, right? Certainly, but that's never really been disputed. Well, it's certainly been disputed by the State that she needs 24-7 care, but it seems to me that five hours a day versus a number of hours a day, I thought that's part of the factual conflict in this case. May I respond to that, Your Honor? I did put it in the form of a question, but I want you to respond to it. Sure. Well, so, so as I said, no court has ever, has ever disputed the uniform testimony of Barbara Harrison's treating physicians that she needs the 24-7 care. And in fact, in footnote 14 of this court's United States versus Mississippi opinion, this court cited the district court's finding with approval that her treating physicians were credible on this point. What the State of Texas has done is not do a medical assessment and not countered the treating physicians' findings and testimony that she required 24-7 licensed nursing care. What the State of Texas has done is simply to say some of the components of that care are not listed in the billing guidelines for the HCS waiver program. And so I'll direct the court's attention to ROA 586. This is a declaration from Robin McEachern, one of the State of Texas nurses. What she says at ROA 586, she says, well, you know, I've seen Barbara Harrison and I originally thought that she needed 10 to 12 hours and some of that would have to be monitoring. But now that I've read the billing guidelines and now that I understand the billing guidelines more clearly, I'm content to say that she only gets five and a half hours because nurse monitoring is not available under the billing guidelines. But that's not a contention that she doesn't need 24 hours, 24-7 care. It's just a contention that the billing guidelines for the HCS waiver program don't allow her to receive that level of care. But... Is there a facility that would provide that, that's funded by the state? Is there a nursing home that would provide 24-7? There is not, Your Honor. There is not. And in fact, the institution that she would have been directed to by the state if she was institutionalized is the Denton State Supported Living Center. And the director, the medical director, Dr. James Galbraith for the Denton State Supported Living Center specifically said, we don't even evaluate what level of care people get here and how we're going to care for that person until they're already here. We can't even tell you exactly what level of care we would give to Barbara Harrison because we don't know. We don't evaluate to determine that. But you know that it doesn't exist. It doesn't exist. What they do at places like Denton State Supported Living Center is they have nurses that are sort of in the area and they come in and check every so often, this sort of thing. But for Barbara Harrison, we're talking about somebody who could, according to her treating physicians, could perish within minutes, long before any nurse that's sort of outside the area could come in and check on her. And so in other nursing homes that aren't the state supported living centers, it's pretty standard to have 40 to 1 staff to patient ratios. You said there were three staff members that have been trained? There are three individuals in the group home. There are three staff members and the registered nurse. I take it, Your Honor, that you're referring to where she is right now. Yeah, okay. So there's three staff members and then there's the registered nurse. The registered nurse is intently involved in all of this. But she, to be honest, the three staff members are not licensed nurses. But she has trained them carefully to notice every possible sign. They're with her all the time, 24-7. This registered nurse has trained them carefully to see any sign of aspiration, any need for suction, and to do that suctioning if she's not right there to take care of it themselves. And is that affordable to be at this, is it affordable, or do you still have the gap between the two? It's, and Your Honor, this is one of the reasons why I call it a very temporary bridge placement. She can't keep it. She can't keep doing this. It's not affordable. Because she's only receiving from the state the five and a half hours that the state offered. And so she's running at a loss right now, is my understanding, and so she can't keep doing it. That's why it's, from our standpoint, it is still a clearly impending risk of institutionalization as noted in United States v. Mississippi. I will note further that it is, all we're asking for here is to have this court not make any grand legal decisions about Olmstead, about the ADA, but rather simply to remand to the district court to do what this court instructed it to do in the first place. Nobody believes this case is moot. Nobody believes this case is moot. The district court simply thought that was true because the district court misunderstood something in the record to mean that the Berry Family Services would continue to care for her five and a half hours a case. That's just simply not the case. They can't do it. They kicked her out. Would you identify what facts need to be found and to what those facts relate legally? Yes. The facts that need to be found by the district court are how much would it cost the state of Texas? There's some federal dollars that go in, some state dollars that go in. How much would it cost the state of Texas to actually care for Barbara Harrison in an institution? Before the state can even offer evidence on that point, it needs to decide how it would actually care for her. There have been no findings on that. Even Dr. Lisa Glenn that said in the record that, well, we can take care, the institution can do it. She never says how. So the district court would have to find out how the state of Texas would actually do it in an institution, how much that would cost the state of Texas in an institution, and then how much it would actually cost the state of Texas to provide general revenue funding.  I beg your pardon, Your Honor? What does it cost in the group home where she is now? Well, it costs the state of Texas five and a half hours of nursing care because that's all that's been being provided. But the reason why we can't use that as a proxy is because the nursing home, the group home owner is, in my understanding, running at a loss. She's only doing this as a bridge placement. The money that she's losing? I beg your pardon? Is she charging that money that she's losing, but she just doesn't get paid? She just doesn't get paid, but that's why she can't do it. She can't . . . Do you know what the amount is? I don't know what the amount is, but that would be an appropriate question for the district court to find. She can only . . . and again, none of this is in the record, but the registered nurse who owns this group home is only doing it because she doesn't want to see Barbara Harrison die, which is the other alternative outcome. So she's trying to do this to help us out to get through this litigation so that this court and the district court below can make a determination on this. It is reasonable, perfectly reasonable, of course, for the district court to make findings on that issue as well. Thank you. Thank you, Your Honor, and may it please the Court. Michael Abrams for HHSC. Ms. Harrison raises two claims in her complaint, a disability discrimination claim and a due process claim. I want to start with the United States v. Mississippi because it forecloses the discrimination claim for several reasons. So as an initial matter, a plaintiff cannot state a viable claim based on the risk of institutionalization, which is what Ms. Harrison has pleaded and argued here. Second, discrimination in the ADA context requires differential treatment among similarly situated individuals, which is something Ms. Harrison has not pleaded, let alone shown. And then third, the ADA does not mandate a particular level of care. This case is not the appropriate vehicle to resolve what type of benefits Ms. Harrison is entitled to. And then turning briefly to Ms. Harrison's due process claim, that claim cannot succeed because the general revenue funds that she seeks access to are not part of Texas's Medicaid plan, and she therefore has no right to a hearing if Texas refuses its discretionary choice to give access to those funds. And I do want to start with the questions about her current placement. So HHSC, if she needs more care, so right now she's eligible for about $128,000. That's what her individualized plan of care is, and the cap is about $168,000. So she could submit a revision request to HHSC at any point if she thinks she needs more treatment, and she hasn't done that. The other thing is that, of course, Ms. Harrison has asserted that this is an emergent situation and she's at serious risk of death or institutionalization if she doesn't receive 24-7 care. She's also, her counsel could have gone to this court or to state court, federal court, and asked for emergency relief if that were the case, and she hasn't done that. And what I think this all goes back to is whether a plaintiff can bring a claim based on a risk of institutionalization in the absence of actual institutionalization. The counsel, you talk about in terms of that, and I certainly understand why you do, United States versus Mississippi, but the risks, it seems to me more fundamentally she's arguing about if I don't get this 24-7 care, I'm going to die. And whether I get it in an institution or in a community care, I need 24-7. And the state of Texas so far says we're not going to provide that level of care. Let me back up just a bit. Do you agree that there's been no determination by the district court of what level of care is required for Ms. Harrison? I would agree that the court didn't weigh the declarations or the submissions of the doctors, Ms. Harrison's treating doctors versus what's . . . The state takes the position she doesn't need 24-7 care, correct? That's correct. Evidence through affidavits or otherwise to that effect, it's challenged in the briefs at least that your experts didn't do an examination, they just looked at records and whatever, but you do have that challenge and the district judge never resolved that, correct? That's right. And I think that there's no . . . I think there is a fact dispute about whether her doctors are right or Dr. Glenn who conducted the general revenue review is right that she doesn't need 24-7 care, but I don't think that that's the material fact dispute here. Moving from that, I want to make sure that was . . . whether it's material or not, I want to make sure that's the case. So rather than being a U.S. versus Mississippi issue, it seems to me that she is tweaking, seeking 24-7 care, may present a medical evidence that she needs it, whether it's accurate or not needs to be determined, and the state's not providing, and she says she's entitled to it, though I want you to . . . I'm not sure exactly under what theory or under what principles. I think she's certainly saying she's qualified to receive it, and the issue may just be whether the state is discriminating against her for not getting it, which gets into the Olmstead factors. I want you to leave your Mississippi for U.S. for just a moment, and you can return to it. Just in terms of our remand decision, what do you say was supposed to be factually determined by the district judge? Sir, I think the district court needed to look at what Ms. Harrison was requesting, and whether what she was requesting was something that anyone in Texas is eligible to receive. How would that person be eligible to it? So if someone is eligible in Texas to receive, if they have a certain level of need that Ms. Harrison did, she's eligible to receive up to the cost gap, and then if the showing is that what her level of need is doesn't exceed that cost gap, that's what she's entitled to receive, and that's what on remand, or following this court's decision, HHSC determined that she did not require 24-7 licensed vocational nursing care, but what she's asking for in her individualized plan of care is something that HHSC just doesn't offer, and so going to the Olmstead case, and especially Justice Kennedy's concurrence, what Justice Kennedy pointed out is that the state doesn't have to create a program, and my friend on the other side says, you know, we're not asking for that, but in practical effect, that is what Ms. Harrison is asking for. Doesn't Olmstead say on a third factor that if, the issue would be on whether it's discrimination, whether this level of care, not the phrasing, the third factor is, could be reasonably accommodated, and I don't think we have any standard for what that means. You may tell me that we do, and I don't know if this case needs to determine what that means. Is that the issue before us, of whether, if there ever is a finding that level of care is required, whether it would be discriminatory not to give it to her? Leaving, again, aside U.S. versus Mississippi, which you'll have free reign to get to in a moment. Sure. So, my friend on the other side suggested that what the district court needs to do is find out the particular costs of what it would take to treat Ms. Harrison in an institution, and that, excuse me, that is the relevant test, and I think that under Olmstead and that's just, you know, this court's prior decision in Harrison, that's not correct, because the relevant test, sure, if we were just looking at what would it cost the state as far as providing Ms. Harrison 24-7 nursing care relative to the entire state budget, that would sort of disadvantage the state in a way that it would require showing the state couldn't meet, but Olmstead says that isn't the test, that isn't what's required, and Justice Kennedy's concurrence goes to that, too. You have to look at the system as a whole, and so what would happen here, if the state were to offer the services and to exceed the cost cap and dip into hundreds of thousands of dollars of general revenue funds, the state could not be in a position to deny the next person those same services, because that is the exact way that the state would be vulnerable to a subsequent disability discrimination claim, to treat different people differently, and we also can't use the general revenue funds in the way that she's asking for, because that would violate state law. State law requires us to determine if there's some other setting in which she could be safely served, and we've determined that she could do that, and so once you get to . . . All those arguments, do you fit them under the category of whether it's a reasonable accommodation? Yes, I think both. I mean, it's whether she is qualified, which in turn requires a determination of whether what she's asking for is a reasonable accommodation, and so that's where the cases like Arc of Washington, the Boyd case out of the Middle District of Alabama that we cite, Sanchez case out of the Ninth Circuit, all of those cases say the state isn't required to increase the cap on the number of people in the program, and this is the same basic argument. It's not that . . . What she's saying, essentially, is that what the state has to do is provide these services, even though it's not something that anyone in Texas is entitled to under the Medicaid waiver program that we carefully negotiated with the federal government, and so no one is entitled in Texas to an individualized plan of care that is $100,000, $200,000 over the cost cap. No one is entitled to a licensed vocational nurse performing tasks that are appropriately reserved for an attendant. But what if it were not $200,000 or $100,000, if it was $15,000? I think that there it might be a closer call, but I think that what's . . . Why is the analysis different? Well, I think that here it's two factors. It's the fact that it's almost double the cost cap, but it's also the testimony of HHSC's declarance about what this program does and doesn't do. So there's testimony from our state that has offered 24-7 licensed nursing care as part of this waiver program, and there's also evidence in the record, and you can also see it in Texas's administrative regulations, about what this program is designed to do, and it's designed to support community living. It's designed to provide adaptive aids to folks who might need it. It's designed to provide employment opportunities. But what it's not designed to do is to provide what you might find in an acute care unit. That's just not something that HHSC has decided to do as part of its waiver program, and of course the state has wide discretion in how it creates its waiver program and how it operates that program. And so the reason that this would not be a reasonable accommodation is because the effect of what Ms. Harrison is asking for is to require the state to increase the cost cap and change the nature of the services that are provided. And so what happens is if we increase the cost cap, first of all, it might be difficult to show, as we are required to do under federal law, that the program is still neutral, cost neutral. But beyond that, it would potentially increase or decrease the amount of people who are seen in the program and provide the fewer people who are part of the program with a higher type of care. And again, Texas has wide discretion in terms of how to structure this particular waiver program to do it a certain way, and in the way that it's doing, it's still treating 30,000 people a year. And I also point out that part of what the Court looked at in Olmstead and post-Olmstead cases is whether the states have a functioning plan for deinstitutionalization. And we cited that deinstitutionalization plan in our brief, and I'd also point out that over time, you know, the state has increased the number of folks who are being treated as part or who are participants in the HCS waiver program. So in 2019, the average across time had been 27,000 folks, and now it's over 30,000 folks. So that's exactly the type of thing that evidence of the state is doing what it's supposed to do in terms of meeting its deinstitutionalization goals. And if the state is doing that, and Olmstead says it's not the state's or the Court's role to tinker with those kinds of plans. And I do think on the United States v. Mississippi, if I could return to that for a second, there was another aspect of that decision that's important, which is that the Court recognized that Justice Kennedy's concurrence was controlling. And Justice Kennedy's concurrence, I think, represented two important things. The first is it recognized that the state has to make difficult choices about who to treat and how to structure its plans. I mean, we've addressed that. But the second thing that Justice Kennedy did is he largely agreed with Justice Thomas that discrimination in the ADA context requires differential treatment. And he posited some ways under the facts of Olmstead that the plaintiffs there might have been able to show that. So, for example, if the state treated the mentally disabled differently from the physically disabled. But here there's no evidence of that. What there is is we have treated Ms. Harrison exactly the same as any other participant of the HCS waiver program. We've evaluated what type of care she needs and determined what type of care she's entitled to. And the District Court pointed out that the appropriate vehicle to challenge that is the court administrative process. So she can challenge the fair hearing officer's decision in that regard. But the ADA is not the appropriate vehicle to decide exactly how many hours of licensed vocational nursing care she requires. That's just something that both, I think, the Olmstead plurality and the concurrence said are beyond the scope of the Americans with Disabilities Act. I did just want to also, if there were no further questions on the discrimination claim, I did just want to briefly address the due process claim. So the prior panel decision, I think, foreclosed the constitutional claim. And now the question is can she bring a claim under the Social Security Act that Texas has to provide her a fair hearing with respect to these general revenue funds? And the Social Security Act requires Texas to provide an opportunity for a fair hearing to the extent her claim for these funds are not part of the plan because under the Texas Administrative Code, and this is 40, Texas Administrative Code 40.01B, a condition to receiving these funds is that federal medical or federal assistance has to be unavailable. And so what that means is that the state cannot go back to the federal government and request reimbursement for services that are offered above the cost cap. And that's what separates it and makes it outside of the Medicaid plan. I think it's just a straightforward definition. And the district court did reach that issue and concluded that Ms. Harrison's claim fails as a matter of law. I'd also want to point out sort of the interesting procedural issue here, which is the district court's mootness determination, yet also the fact that neither party said that the case was moot. In our view, the case wouldn't be moot unless Ms. Harrison came to the court and said, you know, I don't think I need 24-7 nursing care. But the district court didn't find that her due process claim was moot. And that's a claim that she's entitled to a hearing with respect to those funds. So it was a little bit incongruous to say that that claim wasn't moot, and yet her claim as to the actual denial of those funds was moot. I'd also point out sometimes, you know, when the court needs to remand, it's because the district court needs to make fact findings in the first instance, and it's unclear to this court what the district court would do. But here, I think it's completely clear what the district court would find on remand, which is that this ADA claim fails because level of care disputes are not cognizable under Olmstead. In fact, in that regard, the district court basically cited, quoted almost verbatim from footnote 14 of the Olmstead opinion. And so here, given that the court, the district court has signaled exactly what it would do, and given that there are no disputes of material facts on whether what she's asking for is significantly in excess of HHSC's cost gap and is something that isn't part of Texas program, I think a remand would only prolong what is, I think, Judge Southwick or Judge     What I'm saying is that the district court has done a pretty good job of this. I think it's a significantly long litigation. I mean, this case has been pending since 2019, and I don't think any party would benefit from further fact-finding and remand given the lack of certainty in this area. What would you say of the doctrine of law of a case we remanded a year ago, in a couple of months, saying on this record, plaintiff has not shown she can prevail. We managed to get a little bit of evidence for further development of the record and fact-finding however you want to read it, and none of that happened. Well, I think part of that was just the nature of how things developed in the district court. Are we basically ruling in your favor if we agree with you on the exact same record that was before the court a year ago? I would slightly disagree with that in the sense that in the . . . well, when it came back down, she submitted a new individualized plan of care, and that plan of care came out     Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. . . . the district court has turned down .